IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| THOMAS HARDER, | |
|---|---|
| Plaintiff, | 8:18CV58 |
| vs. | |
| UNION PACIFIC RAILROAD COMPANY, | MEMORANDUM AND ORDER |
| Defendant. | |

Defendant, Union Pacific Railroad (UPRR), moves to exclude the expert testimony of Dr. Ernest Chiodo (Dr. Chiodo) and Dr. Hernando Perez (Dr. Perez) at trial. (Filing No. 33; Filing No. 35). Further, UPRR moves for summary judgment claiming no genuine issues of material fact regarding exposure and causation. (Filing No. 37).

For the reasons discussed below, the motion to exclude the expert testimony of Dr. Chiodo and UPRR's motion for summary judgment will be granted. The motion to exclude the expert testimony of Dr. Perez will be denied as moot.

FACTUAL STATEMENT

Plaintiff, Thomas Harder (Harder) was employed by UPRR as a railroad machinist from 1979 to 1987. (Filing No. 1, at CM/ECF p. 2). Harder was diagnosed with follicular lymphoma (a type of Non-Hodgkin's Lymphoma) in 2015 (Filing No. 39-11, at CM/ECF p. 27), and he filed suit under the Federal Employers' Liability Act (FELA) alleging his lymphoma was caused by exposure to toxic substances while working on locomotives. (Id.).

Harder designated Dr. Chiodo as a medical expert, "who will testify as to general and specific causation…" ([Filing No. 39-2, at CM/ECF p. 1](#)). Dr. Chiodo's opinion concentrates on diesel exhaust and benzene, a component of diesel exhaust, solvents, and welding fumes. ([Filing No. 39-3, at CM/ECF p. 50-51](#)). UPRR claims "Dr. Chiodo's opinions are flawed regarding his methodology and lack of scientific and factual support requiring exclusion under [Fed. R. Evid. 702, 703, 705](#), and [Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)](#)." ([Filing No. 34, at CM/ECF p. 4](#)).

Harder designates Dr. Perez as his liability expert, "who will testify, generally, as to notice and foreseeability… including exposure to carcinogens and the railroad industry's knowledge of the hazards of exposure to toxins." ([Filing No. 39-2, at CM/ECF p. 1](#)). UPRR claims Dr. Perez's opinions should be excluded as they "are nothing more than speculation based on Mr. Harder's 30-year-old recollection of his work environment." ([Filing No. 36, at CM/ECF p. 3](#)).

## DAUBERT MOTION

Harder's sole claim against UPRR is for negligence under the FELA. The FELA provides railroad employees with a federal claim for injuries "resulting in whole or in part from the negligence" of the railroad. [45 U.S.C. § 51](#). The statute imposes upon employers a continuous duty to provide a reasonably safe place to work. [Cowden v. BNSF Ry. Co., 690 F.3d 884, 889 (8th Cir. 2012)](#). The FELA is to be liberally construed, but it is not a workers' compensation statute, and the basis of liability is "negligence, not the fact that injuries occur." [Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 543 (1994)](#). To prevail under the FELA, Harder must prove the elements of a negligence claim; duty, breach, foreseeability, and causation. [Crompton v. BNSF Ry. Co., 745 F.3d 292, 296 (7th Cir. 2014)](#); [Tufariello v. Long Island R. Co., 458 F.3d 80, 87 (2d Cir. 2006)](#).

## I. Standard of Review

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The court must assume a gatekeeping function to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589. To carry out this function, the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

> A witness can be qualified as an expert by "knowledge, skill, experience, training, or education," Fed.R.Evid. 702, and it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case. See Kumho Tire, 526 U.S. at 156, 119 S.Ct. 1167.

Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 715 (8th Cir. 2001). The party offering the challenged testimony bears the burden of establishing admissibility by a preponderance of the evidence. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (citing Daubert, 509 U.S. at 592).

Daubert established a non-exclusive checklist for trial courts to use in assessing the reliability of expert testimony, including whether the theory or technique can and has been tested, whether it has been subjected to peer review, whether there is a high known or potential rate of error, and whether the theory or technique enjoys general acceptance within a relevant scientific community. See U.S. v. Holmes, 751 F.3d 846, 850 (8th Cir. 2014) (citing Daubert, 509 U.S. at 592-94). And for the purposes of evaluating the relevance of expert testimony, the Court must determine whether the expert's reasoning or methodology was applied properly to the facts at issue. Daubert, 509 U.S. at 580. To that end, expert testimony that is speculative, unsupported by sufficient facts, or contrary to the facts of the case, is inadmissible. Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757 (8th Cir. 2006).

The Court applies a relaxed standard of causation under the FELA. CSX Transp., Inc. v. McBride, 564 U.S. 685, 131 S.Ct. 2630, 2636, 180 L.Ed.2d 637 (2011); Paul v. Missouri Pac. R. Co., 963 F.2d 1058, 1061 (8th Cir. 1992). "Under [the FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Id. This modified standard of causation does not, however, change the Daubert analysis. See Steggall v. BNSF Ry. Co., No. 7:18CV5000, 2019 WL 1492579, at *3 (D. Neb. Apr. 4, 2019) ("The Daubert standard governs the application of Rule 702 and applies to FELA and non-FELA actions."); In re Conrail Toxic Tort Fela Litig., No. CIV. A 94-11J, 1998 WL 465897, at *6 (W.D. Pa. Aug. 4, 1998) (holding Daubert is properly applied in a FELA case); Hose v. Chi. Nw. Transp. Co., 70 F.3d 968, 972 (8th Cir. 1995) (applying Daubert in a FELA action challenging plaintiff's proposed expert testimony).

## II. The Opinion of Dr. Chiodo

Dr. Chiodo opines Harder's exposure to diesel exhaust, solvents, welding fumes, and benzene in the workplace caused or contributed to his development of follicular lymphoma. ([Filing No. 39-4, at CM/ECF p. 8](); [Filing No. 39-3, at CM/ECF p. 4]()). Dr. Chiodo is a well-qualified, highly credentialed expert in the medical fields of internal and occupational medicine. Further, he is certified in the engineering and public health discipline of industrial hygiene. He also describes himself as a toxic tort lawyer. ([Filing No. 39-3, at CM/ECF p. 28]()).

Dr. Chiodo based his opinion on the review of medical records, his conversation with Harder, and his knowledge, training, and experience. (E.g., [Filing No. 39-3, at CM/ECF p. 9](); [Filing No. 39-3, at CM/ECF p. 51]()). He states he did not rely on any studies or literature to make his opinion, but after reaching his opinion, he looked for literature to corroborate it. (E.g., [Filing No. 39-3, at CM/ECF pp. 9-10](); [Filing No. 39-3, at CM/ECF p. 25](); [Filing No. 39-3, at CM/ECF p. 51]()). Dr. Chiodo did not search for articles that may contradict his opinion. ([Filing No. 39-3, at CM/ECF p. 67]()).

Dr. Chiodo has no clinical experience with follicular lymphoma and does not recall treating a patient with that disease. ([Filing No. 39-3, at CM/ECF pp. 41-42]()). He has not written any peer-reviewed or published papers on follicular lymphoma, ([Filing No. 39-3, at CM/ECF pp. 42-43]()), nor conducted research studies relating to oncology and welding fumes or solvents. ([Filing No. 39-3, at CM/ECF pp. 44-45]()). The only research he performed relating to the association between follicular lymphoma and diesel exhaust is what he refers to as "secondary research," encompassing reviewing literature and epidemiologic studies. ([Filing No. 39-3, at CM/ECF p. 45]()).

### a. Causation

To prove causation in a toxic tort case, a plaintiff must show both general causation, "that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as the plaintiff" and specific causation, "that the toxin was the cause of the plaintiff's injury." Mattis v. Carlon Elec. Prod., 295 F.3d 856, 860 (8th Cir. 2002).

### i. General Causation

UPRR argues Dr. Chiodo's opinion on general causation is not based on any accepted scientific methodology. (Filing No. 34, at CM/ECF p. 18). Dr. Chiodo testified his methodology for determining the alleged exposures can cause follicular lymphoma was based on his "knowledge, training, and experience.[1]" (Filing No. 39-3, at CM/ECF p. 10). After forming his opinion that diesel exhaust, solvents, welding fumes, and benzene cause follicular lymphoma, Dr. Chiodo found studies he believes corroborate his opinion. (Id.). UPRR alleges the articles Dr. Chiodo located do not suggest causation, but only mere association, (Filing No. 34, at CM/ECF p. 18), and Dr. Chiodo used no scientific methodology to "bridge the analytical gap between association and causation." (Filing No. 34, at CM/ECF p. 21).

---

[1] Throughout the deposition, Dr. Chiodo made it clear that he needed nothing more than his own knowledge, training, and experience to opine diesel exhaust, solvents, welding fumes, and benzene cause follicular lymphoma.

> Somewhere along the line I developed an appreciation and opinion that the exposures in this matter are more likely than not individually or in combination causes of his non-Hodgkin's lymphoma, follicular or whatever type he has, just causes of non-Hodgkin's lymphoma. That's my opinion and I have corroborated my opinion with citations from the peer-reviewed literature. Really, so you're asking me, again, you're asking somebody that has a bunch of degrees, multiple, ma'am, I've got nine degrees.

(Filing No. 39-3, at CM/ECF p. 45).

A medical expert need not always cite published studies on general causation to reliably conclude that a particular object caused a particular illness. Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1209 (8th Cir. 2000) (citing Heller v. Shaw Indus., Inc., 167 F.3d 146, 154 (3d Cir. 1999)). The Court further explained,

> The first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed. If a properly qualified medical expert performs a reliable differential diagnosis through which, to a reasonable degree of medical certainty, all other possible causes of the victims' condition can be eliminated, leaving only the toxic substance as the cause, a causation opinion based on that differential diagnosis should be admitted.

Turner, 229 F.3d at 1208-09.

Based on the holding in Turner, cited published studies on general causation are not necessarily required if the expert performs a reliable differential diagnosis.

ii. Specific Causation

Expert testimony is "reliable," when it is based on "methods and procedures of science," rather than "subjective belief or unsupported speculation." Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997), as amended (Dec. 12, 1997); See also Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056 (8th Cir. 2000) (stating expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case). A district court is not required to "admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 137 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Id. at 143.

In order to carry the burden of establishing Harder was exposed to and injured by workplace toxins, "a plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover." Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir. 1999).

> It is therefore not enough for a plaintiff to show that a certain chemical agent sometimes causes the kind of harm that he or she is complaining of. At a minimum, we think that there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered.

Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1107 (8th Cir. 1996).

Dr. Chiodo asserts he conducted a "differential diagnosis of etiology" in this case. (Filing No. 39-3, at CM/ECF p. 47). The Eighth Circuit has held "a medical opinion about causation, based upon a proper differential diagnosis is sufficiently reliable to satisfy Daubert." Bland v. Verizon Wireless, (VAW) L.L.C., 538 F.3d 893, 897 (8th Cir. 2008); Turner, 229 F.3d at 1208. "In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 989 (8th Cir. 2001).

UPRR disputes Dr. Chiodo reliably "ruled in" alleged exposures as causes of Harder's follicular lymphoma. (Filing No. 34, at CM/ECF p. 27). Dr. Chiodo listed potential risk factors for follicular lymphoma as: exposure to diesel exhaust, solvents, welding fumes and benzenes, as well as age, smoking, radiation, bad

luck/the vagaries of cancer, and possibly genetics. (Filing No. 39-3, at CM/ECF pp. 46-47; Filing No. 39-3, at CM/ECF p. 50). Dr. Chiodo claims he "ruled in" Harder's age, occupational exposures, and bad luck/the vagaries of cancer. However, Dr. Chiodo is not aware of any specific details of Harder's alleged exposures. He is unaware of Harder's length of exposure, concentration of exposure, and the atmosphere of exposure[2]. Dr. Chiodo never asked for copies of the MSDS or SDS sheets on locomotive fuel, benzine, diesel exhaust, or solvents from UPRR for the time period of Harder's employment. (Filing No. 39-3, at CM/ECF pp. 21-22; Filing No. 39-3, at CM/ECF p. 31). He relied on no data or facts to determine the level or length of Harder's exposure to solvents and welding fumes. (Filing No. 39-3, at CM/ECF p. 30; Filing No. 39-3, at CM/ECF p. 35). He did not request to see UPRR's air sampling data regarding exposure levels in its machine and diesel shops. (Filing No. 39-3, at CM/ECF p. 22; Filing No. 39-3, at CM/ECF p. 55). And he did not consider Dr. Perez' report to formulate his opinion. (Filing No. 39-3, at CM/ECF p. 16).

---

[2] Dr. Chiodo's entire deposition testimony was unnecessarily contentious, containing multiple instances of Dr. Chiodo refusing to properly and thoroughly answer the question posed, particularly questions related to Harder's actual exposure. For example,

> Q: Let's move on to benzene.
> A: Okay.
> Q: Did [Harder] tell you he was exposed to benzene?
> A: Same answer that I had given about recall regarding diesel exhaust is the same answer concerning benzene.
> Q: Was that something you asked him about?
> A: Same answer I gave about recall concerning diesel exhaust as this matter. I don't recall.

(Filing No. 39-3, at CM/ECF p. 20).

> Q: With regard to solvents and welding fumes, what data and facts did you rely upon to determine Mr. Harder's exposure to solvents and welding fumes?
> A: Same answers that I gave you about benzene, diesel exhaust. So, if you substitute the word solvents for that, it would be the same answers to all the questions.
> Q: And what is that answer, Doctor, for the record?
> A: Just refer, take all my answers where you asked that question and you asked it multiple times as it relates to diesel exhaust, benzene, it would be the same answers as to welding fumes and solvents.

(Filing No. 39-3, at CM/ECF pp. 30-31).

Dr. Chiodo's based his opinion of Harder's exposure primarily[3] on a telephone conversation with Harder where Harder described his perception of his own exposure, which was summarized by Dr. Chiodo in two sentences in his report. ([Filing No. 39-3, at CM/ECF p. 10](); [Filing No. 39-4, at CM/ECF p. 3]()).

> Q: And when you went into or you began your interview with Mr. Harder, what was your intent? What did you hope to find out?
>
> A: What his likely exposures were. I would have some understanding because, again, as a certified industrial hygienist and an occupational medicine doctor, among other areas of expertise, I have some appreciation as to what his likely exposures would be, but this fleshes out, his conversation fleshed out his perceptions of his exposures, so I gained greater information by taking the time to call and speak to him about what he perceived his exposures were and the type of work he did.

([Filing No. 39-3, at CM/ECF p. 13]()). Dr. Chiodo is not aware of Harder's specific exposure to carcinogens. Rather, he testified that he can form a medical causation opinion without any knowledge of the type, extent, or duration of toxin exposure because any exposure to a toxin can cause cancer. ([Filing No. 39-3, at CM/ECF pp. 55-56]()).[4] Even assuming Chiodo is correct—that any level of exposure to toxins

---

[3] Dr. Chiodo states he also reviewed medical records, items of discovery, and his knowledge, training and experience to form his opinion on exposure.

> Q: What data and facts can you tell me in the records that would support your conclusion that he had heavy exposure?
> A: I reviewed the medical records, part of what I reviewed, as I've just said in my last testimony. I reviewed it. I reviewed the Interrogatories. I reviewed the requests for production. I reviewed the medical records. I interviewed Mr. Harder and I also have an understanding of what type of exposures you have given my knowledge, training and experience. The combination circulates through the – the methodology circulates through the neurons in my brain to say, yeah, I think that given this combination and information, he had exposures to what I've stated in my report that were sufficient to have caused his non-Hodgkin's lymphoma, either individually or in combination. I don't know how I can get more clearer than that, ma'am, but one of us is either slow or acting like we're slow.

([Filing No. 39-3, at CM/ECF pp. 35-36]()).

[4] Q: Do you have an opinion as to the dose response for how much exposure, what amount duration of exposure to diesel exhaust, for example, would cause or could cause follicular lymphoma?

can cause cancer—the doctor makes no attempt to discern when the level and length of toxin exposure crosses the line from of a mere possible cause to a probable or likely cause of follicular lymphoma, or that Harder's exposure met or exceeded that exposure level.

Despite repeated questioning, Dr. Chiodo's did not and/or could not articulate any reliable basis for knowing the level and length of Harder's exposure to diesel fumes, or that the level of Plaintiff's exposure is causally related to developing lymphoma. Plaintiff has therefore failed to meet his burden of proving Harder's exposure to diesel fumes during his railroad employment was a cause of his lymphoma. No one questions Dr. Chiodo's professional credentials, but an opinion based solely on his credentials, with no useful explanation of how the facts of this case support the opinion, is useless to the jury. See Bland v. Verizon Wireless, (VAW) L.L.C., 538 F.3d 893, 897 (8th Cir. 2008) (affirming the district court's exclusion of a doctor's causation opinion which lacked grounds for determining whether Plaintiff was exposed to a sufficient dose of toxins).

---

A: There is no threshold value. Within medicine, within toxicology there's a principle called the single hit theory. Toxins, carcinogenic effects do not have a threshold. . . . There is no level that you or any other expert in my opinion can credibly say below this level, no, that's the threshold you can't get cancer. Maybe somebody has written an article for that along those lines. That would be inconsistent with what I've learned about the discipline.

. . .

Q: What amount is -- so you talked about the non-observed effect level. What amount of diesel exhaust is sufficient to cause follicular lymphoma?

A: Ma'am, you just didn't listen to my testimony. There is no threshold. Do I have to repeat it again? I was really clear, so let me slow down. There is no threshold level. When you say what level is sufficient, there is no, there is no threshold level for carcinogens. Theoretically, smoking one cigarette can cause it. There is no threshold. Is it likely you're going to get lung cancer from smoking one cigarette? No, it's unlikely, but it doesn't mean you can't because there is no threshold when you talk about a carcinogen. That's the basic principle within toxicology, within industrial toxicology.

(Filing No. 39-3, at CM/ECF pp. 55-56).

Even assuming Dr. Chiodo properly "ruled in" Harder's age, occupational exposures, and bad luck/the vagaries of cancer, he did not endeavor to "rule out" causes—a necessary step in performing a differential diagnosis. (Filing No. 39-3, at CM/ECF pp. 50-51). Dr. Chiodo admits that the leading risk factor is age and even if Harder didn't work at the railroad, he could have developed follicular lymphoma because of his age. (Filing No. 39-3, at CM/ECF p. 49; Filing No. 39-3, at CM/ECF p. 57).

The relaxed standard of causation under FELA still requires an expert applying a differential diagnosis to "rule out" alternative causes as the sole cause. See Brown v. Burlington N. Santa Fe Ry. Co., 765 F.3d 765, 773 (7th Cir. 2014); In re Conrail Toxic Tort Fela Litig., No. CIV. A 94-11J, 1998 WL 465897, at *6 (W.D. Pa. Aug. 4, 1998). Dr. Chiodo failed to reliably perform the differential diagnosis by neglecting to carry on the second step of "ruling out." Therefore, Dr. Chiodo's opinion is scientifically unreliable and will be excluded. In re Viagra Prod. Liab. Litig., 658 F. Supp. 2d 950, 959 (D. Minn. 2009) (holding a failure to "rule out" other possible causes will render the differential diagnosis scientifically unreliable).

MOTION FOR SUMMARY JUDGMENT

UPRR filed for summary judgment, arguing Harder cannot make a *prima facie* FELA case without proving causation. The railroad argues the plaintiff must offer expert testimony to support his claim of medical causation, Dr. Chiodo's expert opinion on causation is unreliable and inadmissible and as such, UPRR is entitled to summary judgment. (Filing No. 38, at CM/ECF p. 7).

I. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Dancy v. Hyster Co., 127 F.3d 649, 652-53 (8th Cir. 1997). The court does not weigh evidence in the summary judgment record to determine the truth of any factual issue. It merely determines whether there is evidence creating a genuine issue for trial. Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999).

The moving party bears the burden of showing there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are left for trial. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Anderson, 477 U.S. at 251-52.

II. Discussion

To be successful on his FELA claim, Harder must prove causation. Expert testimony is required to establish causation in a FELA case. Brooks v. Union Pac. R. Co., 620 F.3d 896, 899 (8th Cir. 2010). Dr. Chiodo, the designated expert to

testify about causation, has not provided a reliable scientific opinion, as required by Daubert. As such, the motion for summary judgment will be granted.[5]

Accordingly,

IT IS ORDERED:

1) The motion to exclude the expert testimony of Dr. Chiodo (Filing No. 33) is granted.

2) The motion for summary judgment (Filing No. 37) is granted.

3) The motion to exclude the expert testimony of Dr. Perez (Filing No. 35) is denied as moot.

4) Judgment will be entered accordingly.

Dated this 29th day of January, 2020.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

[5] Since summary judgment will be granted in UPRR's favor, the court need not and does not address UPRR's motion to exclude the industrial hygiene opinions of Dr. Perez. UPRR's Daubert motion to exclude Dr. Perez' testimony will be denied as moot.